

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-19-1999

# Taylor v. Pathmark

Precedential or Non-Precedential:

Docket 97-7617

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"Taylor v. Pathmark" (1999). *1999 Decisions.* Paper 138.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/138

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 19, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 97-7617

JOSEPH B. TAYLOR,
Appellant

v.

PATHMARK STORES, INC.

On Appeal From the United States District Court
For the District of Delaware
(D.C. Civ. No. 96-cv-00337)
District Judge: Honorable Joseph J. Farnan, Jr.,
Chief Judge

Argued: February 9, 1999

Before: BECKER, Chief Judge, and McKEE, Circuit Judges
and LEE, District Judge.*

(Filed May 19, 1999)

       GARY W. ABER, ESQUIRE
        (ARGUED)
       Heiman, Aber, Goldlust & Baker
       First Federal Plaza, Suite 600
       702 King Street
       P.O. Box 1675
       Wilmington, DE 19899

Counsel for Appellant

_____

*Honorable Donald J. Lee, United States District Judge for the Western
District of Pennsylvania, sitting by designation.

MICHAEL F. KRAEMER, ESQUIRE
 (ARGUED)
DEBBIE RODMAN SANDLER,
ESQUIRE
White & Williams, LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395

HAL R. CRANE, ESQUIRE
Pathmark Stores, Inc.
301 Blair Road
Woodbridge, NJ 07095-0915

Counsel for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

This case arises under the Americans with Disabilities Act ("ADA"). The plaintiff, Joseph B. Taylor, sued Pathmark Stores, Inc. ("Pathmark") in the District Court, alleging that Pathmark had discriminated against him on the basis of his disability or, in the alternative, that Pathmark wrongly regarded him as disabled. The District Court granted judgment as a matter of law for Pathmark on both claims. We will affirm the District Court's judgment on Taylor's claim that he was disabled within the meaning of the ADA, but reverse the judgment insofar as the District Court determined that Taylor was not regarded as disabled for the period between December 1995 and his rehiring in July 1997. In so doing, we reaffirm that, to successfully claim that he was wrongly regarded as disabled from working, a plaintiff need not be the victim of negligence or malice; an employer's innocent mistake (which may be a function of "goofs" or miscommunications) is sufficient to subject it to liability under the ADA, see Deane v. Pocono Med. Ctr., 142 F.3d 138, 143 n.4 (3d Cir. 1998) (en banc), although the employer's state of mind is clearly relevant to the appropriate remedies. We recognize, however, a limited defense of reasonable mistake where the employee is responsible for the employer's erroneous perception and the

2

employer's perception is not based on stereotypes about disability. Under these tests, material issues of fact remain for resolution at trial.

Because of its structure and subject matter, the ADA is often a difficult statute for courts and employers to interpret and, sometimes, to follow. This case is also a difficult one, not only conceptually but also because of the odd (if not convoluted) factual background, punctuated by glitches and apparent misinterpretations of medical records, to which we now turn.

I. Factual Background

Taylor began working at Pathmark in May 1981 and was eventually promoted to frozen food manager. In December 1991, he slipped on a piece of cellophane at work and strained his right ankle. His doctor instructed him to rest the ankle for ten minutes each hour, and to refrain from walking or standing for extended periods of time. Taylor aggravated the injury in January 1992 when he fell down a flight of stairs. He took time off from work, and when he returned in November 1992 he was told that the frozen food manager post had been filled during his absence. In the following months, he was given various light duty assignments that accommodated his limitations. He stocked shelves, occasionally sitting on a milk crate to do so, and worked in the service center, which allowed him to sit at a desk for a portion of the day. He was often allowed to work on the "bag your own" register at which customers bagged their groceries and he could sit on a stool. In November 1993, Taylor had arthroscopic surgery, a minimally invasive procedure, on his ankle.

The parties have stipulated that Taylor has a 16% permanent disability in his right ankle. When he was working on light-duty assignments, Taylor wore either an air cast or a cast type shoe, and when he exceeded his limits on standing and walking for more than fifty minutes an hour, he used a crutch or cane. Pathmark allowed this periodic resting and use of a crutch or cane until April 29, 1994. While accommodated in this fashion, Taylor was productive and Pathmark's manager considered him a problem-free employee.

3

In early March 1994, Taylor's store manager asked him to provide an updated note from his doctor setting forth any continuing restrictions on work assignments. His family doctor, Dr. Moore, provided a note stating that Taylor could continue to work, but without prolonged standing. Later that month, without Taylor's knowledge, Pathmark's corporate headquarters sent a request for an updated record for Taylor to his orthopaedic specialist, Dr. Gelman. Dr. Gelman replied, in an April 7, 1994, letter, that he had not seen Taylor since December of 1993 but that he believed that Taylor could return to work without any restrictions, basing his opinion on the fact that Taylor had not returned to see him.

Relying on Dr. Gelman's letter, Taylor's manager told him on April 29 that he had to work a full-duty cash register for a day. Taylor felt that he could not comply, refused, and eventually left the store. He contacted Pathmark's workers' compensation representative and learned for thefirst time of Dr. Gelman's letter. He sought an examination with Dr. Gelman, after which, on May 5, the doctor sent Pathmark another letter stating that Taylor could engage in "full-time work--limited standing." Pathmark's administrative offices, however, never forwarded the letter to Taylor's manager and he was not asked to return to work. Pathmark's internal email suggested that there was a "glitch" in this series of events because of Dr. Gelman's initial problematic evaluation. Taylor's store manager likewise admitted that Dr. Gelman's first letter was incorrect and that Dr. Moore's note was probably more accurate, but the manager was never given Dr. Gelman's updated note of May 5. When Taylor called his manager about getting back on a work schedule, his manager told him, "I don't care."

On May 27 and September 2, 1994, Pathmark sent Taylor to Dr. Case, an orthopaedic surgeon. After the first visit, Dr. Case wrote to Pathmark counsel that Taylor could work with restrictions, but Pathmark did not invite him to return to work. After the September visit, Dr. Case told Pathmark that Taylor could return to work with an air splint.[1]

_____

1. There is testimony in the appellate record that Case's report said that Taylor used an air splint while working, but no testimony that Case instructed Taylor to do so.

Pathmark apparently took no action for approximately one year thereafter.

In September 1995, Pathmark's ADA Committee evaluated Taylor and sent Dr. Moore a questionnaire asking about Taylor's restrictions. Dr. Moore reported to the committee on October 5, 1995, that Taylor was temporarily subject to increased work restrictions due to an aggravation of his ankle injury in July 1995. The form Pathmark provided allowed him to check either "permanent" or "temporary," and Dr. Moore checked "temporary," writing in that the restrictions would last for six months or more. Taylor wrote to Pathmark on December 19, 1995, representing that his temporary restrictions had been lifted and that he could work under his permanent limitations as he had been doing prior to April 1994. The evidence was that Pathmark's ADA Committee evaluated his case in late 1995, but took no action on it for approximately seven months, for reasons that are not apparent.

Pathmark fired Taylor by letter dated May 13, 1996. The letter, which was written by the ADA Committee, stated that Taylor's inability to work "effectively severs your employment relationship with Pathmark as of May 13, 1996." The letter recited that Dr. Moore's restrictions allowed Taylor to: stand one hour at a time up to four hours a day; walk one hour at a time not to exceed one hour a day; lift, carry, push, and pull ten pounds frequently, up to twenty pounds occasionally, and never over twenty pounds; and occasionally bend, squat, climb, and reach. The letter further stated that Taylor's restrictions precluded crawling or repetitive pushing and pulling of leg controls and required breaks to be taken as necessary. The letter continued that, comparing the restrictions with the physical requirements of the frozen food manager job,

> [t]hese restrictions on your work related activities are such that any reasonable accommodation which Pathmark might provide are insufficient to enable you to function to standard in your position as a Frozen Food Manager which regularly requires:
>
> * Regularly lifting and carrying 25 pounds

5

            * Frequently stooping, crouching and reaching

            * Extended standing and walking

            Furthermore, your restrictions are such that you
            cannot perform the essential functions of any other
            available position, all of which require extended
            standing and/or walking and regular reaching. We
            have been advised your restrictions are permanent.

App. at A55–56 (emphasis added).

After Taylor received this letter, he contacted Dr. Moore, who clarified his position that Taylor had been temporarily, but not permanently, heavily restricted and that Taylor could work with either ten minute rest breaks per hour or the use of a cane or crutch. Pathmark asked Dr. Moore to fill out a new capabilities form, which he did on June 19, 1996, restating these restrictions, but Taylor was not reinstated. There was testimony that the ADA Committee realized that its May 13 letter was mistaken, but it never reconsidered Taylor or looked into giving him a cashier's job with a stool, though he could have been accommodated. Instead, the Committee referred the matter to Pathmark's legal department and heard no more about it. Meanwhile, Pathmark's workers' compensation department was insisting that he could return to work full-time. From 1994 on, Taylor had regularly contacted Pathmark, asking for work, and his union representative had also tried to get him back to work. After he was fired, he brought this suit. He was rehired in July 1997, during the pendency of this litigation, and is currently employed as a third-shift non-foods clerk.

Taylor argues that Pathmark should have given him a job that he could do. Pathmark's Store Operations Employment Compliance Manual provides for reasonable accommodation in cashier positions for people who have trouble standing for extended periods. Pathmark's ADA Training for Management Associates manual also suggests that stools are reasonable accommodations for people who cannot stand for long periods. Taylor's last store manager conceded that when Taylor was out on disability he should have been considered for a cashier position with a stool. Moreover, Taylor and his vocational expert, Thomas Yohe, offered

6

testimony that the frozen food manager job requires a significant amount of book work, sales planning, schedule writing, looking up orders, checking bills, preparing signs, and using a computer, all of which can be done while sitting. This amounts to forty-five minutes to an hour of sitting per day. Combined with sitting during Taylor's morning, afternoon, and lunch breaks, which amount to forty minutes per day, Taylor argues that he would be off his feet ten minutes per hour without accommodation. Yohe testified that Taylor's restrictions could be accommodated in his previous Pathmark jobs, including the frozen food manager job, with the "minor" accommodation of allowing him to use a milk crate to sit on or to prop up his foot.

After Taylor had presented his evidence at trial, the District Court granted "summary judgment" for Pathmark. It would be more accurate to state that the District Court granted a motion under Fed. R. Civ. Proc. 50(a). Because the District Court dismissed the case after Taylor presented his evidence to a jury, Pathmark suggests that we should give increased deference to the trial judge. Unsurprisingly, Pathmark cites no authority for this proposition and, since Taylor's claims were not in fact evaluated by his chosen finder of fact, we disagree. At all events, Pathmark concedes that the proper test is the standard one: We must view the facts in the light most favorable to Taylor.

II. Was Taylor "Disabled" Under the ADA? (Was He
     Substantially Limited in the Major Life Activities of
      Walking and Standing?)

Taylor's first theory is that he has a "disability" under the ADA, which covers impairments that substantially limit a major life activity. EEOC regulations provide, and no one here contests, that walking and standing are major life activities. See 29 C.F.R. S 1630.2(1) App. (1996). "Substantial limitations" are those that render an individual

        (i) unable to perform a major life activity that the
        average person in the general population can perform;
        or

7

(ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. S 1630.2(j)(1) (1996). The relevant factors are (1) the nature and severity of the impairment; (2) the duration or expected duration; and (3) the expected or actual permanent or long-term impact of or resulting from the impairment. See 29 C.F.R. S 1630.2(j)(2). The impairment must be severe when compared to the functioning of the general population. The purpose of the ADA would be undermined if protection could be claimed by those whose relative severity of impairment was widely shared. See Forrisi v. Bowen, 794 F.2d 931, 934 (4th Cir. 1986). On the other hand, Congress expressed a strong remedial intent in enacting the ADA, and explicitly found that approximately forty-three million Americans were disabled as of 1990, see 42 U.S.C. S 12101(a)(1) (1998), which implies that the definition should not be so restricted that only the most extremely impaired are covered.

Taylor testified that he walks with a slight limp and requires ten-minute hourly breaks when standing or walking. His girlfriend, however, testified that he regularly takes walks after dinner and stated that he does not require a cane or crutch. The District Court concluded that Taylor did not have a disability. Taylor objects that the District Court drew incorrect inferences from his girlfriend's testimony. She testified that Taylor takes the car out for one-and-a-half to three hours after dinner, that she did not know how much time he actually spent walking because she was not with him, and that he carries a walking stick. Thus, he argues, a jury could infer that he cannot walk unassisted for long periods of time.

Even considering this testimony in the light most favorable to Taylor, the court's conclusion is sensible. The court noted that there was no testimony that Taylor stands or walks, during the fifty minutes per hour that he can, with any less ability than the average person. The EEOC's regulations define a person with a walking disability as

8

someone who "can only walk for very brief periods of time." 29 C.F.R. S 1630.2(j) App; cf. Deane, 142 F.3d at 143 n.4 (regulations are entitled to substantial deference). We agree with the District Court that fifty minutes (per hour) is not a "very brief" period.

In Kelly v. Drexel University, 94 F.3d 102 (3d Cir. 1996), we found that a man who limped as a result of a hip injury, could not walk more than a mile, and had to climb stairs slowly was not disabled. We concluded that the restrictions on his ability to walk were "comparatively moderate," citing several district court cases that rejected similar claims. Id. at 106. Pathmark has also cited other cases in which walking problems were found not to constitute covered disabilities. See, e.g., Oesterling v. Walters, 760 F.2d 859, 861 (8th Cir. 1985) (a woman whose varicose veins prevented her from standing or walking for long periods was not disabled under the Rehabilitation Act's similar definition); Penchisen v. Stroh Brewing Co. , 932 F. Supp. 671, 674 (E.D. Pa. 1996) (a woman with a metal plate in her left ankle who could not fully flex her foot or walk with a normal gait was not disabled), aff'd, 116 F.3d 469 (3d Cir.), cert. denied, 118 S. Ct. 178 (1997).

Taylor argues that Pathmark only allows one break every two hours and that his need for a break every hour makes him function at less than fifty percent of a typical Pathmark employee. The District Court responded that the standard is one of comparison to the "average person in the general population." 29 C.F.R. S 1630.2(j)(1) (1996). Taylor presented no evidence that Pathmark employees resembled the general population in average ability, though he did plausibly argue that Pathmark employed people of average ability. The more important point is that Taylor is mixing scales of measurement. That he can only stand for half as long as the average Pathmark employee, or average person, is not necessarily proof that he is substantially impaired in his ability to stand. The relevant question is whether the difference between his ability and that of an average person is qualitatively significant enough to constitute a disability. Because Taylor can stand and walk for fifty minutes at a time, and can continue for longer periods if he takes a break every hour, he can carry out most regular activities

that require standing and walking, even though he may not be able to perform Pathmark's jobs without accommodation. We conclude that his ability to walk and stand is not significantly less than that of an average person.

Taylor finally argues that the employee in Kelly had no evidence that he used any special device, cane, or crutches to aid in walking. By contrast, Taylor needs a cane or crutch after fifty minutes and uses a prosthetic shoe to ease his pain and discomfort. Under our jurisprudence, the determination whether a disability exists must be made by evaluating a person's impairment as it affects major life activities without the use of mitigating measures, even if the person uses such mitigating measures in regular activity. See Matczak v. Frankford Candy & Chocolate Co., 136 F.3d 933 (3d Cir. 1997).[2] Taylor contends that the District Court improperly took mitigating measures into account when determining his abilities by failing to note that Taylor needed ameliorative footwear to maintain his present level of mobility.

If Taylor had needed a cane or crutch to stand forfifty minutes an hour, his argument would be persuasive. But there is no evidence that Taylor required an assistive device to stand or walk for at least fifty minutes an hour. If he wanted to stand for longer, he needed a cane or crutch, but someone like Taylor who can stand for fifty minutes unassisted is not substantially limited in standing, and thus his need for assistance to improve his performance does not show that he has a disability. As for the air cast/cast type shoe, Pathmark argues that no doctor ever ordered him to use such devices, and that if he did so for his own comfort that cannot prove his disability. See Douglas v. Victor Capital Group, 21 F. Supp. 2d 379 (S.D.N.Y. 1998) (plaintiff used cane or crutches on occasion, but there was no evidence he was medically required to do so, and voluntary use could not meet his burden of proof). We have not been able to find evidence in

_____

2. The Supreme Court will decide this issue shortly. See Sutton v. United Air Lines, Inc., 119 S. Ct. 790 (1999), granting cert. to 130 F.3d 893 (10th
Cir. 1997).

the record that a doctor ordered Taylor to use an air cast, and we believe that occasional use of an air cast to diminish discomfort does not raise Taylor's condition to the level of a disability.3 Therefore we will affirm the District Court's judgment on the issue of whether Taylor was actually substantially limited in the major life activity of walking.

III. Was Taylor "Regarded as" Disabled?

A person is "regarded as" having a disability if the person:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation;

> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

> (3) Has [no such impairment] but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. S 1630.2(l) (1996). Taylor argues that Pathmark regarded him as disabled by virtue of the ADA Committee's determination that he was too impaired to take any Pathmark job, with or without accommodation.

The gravamen of Taylor's claim is that Pathmark perceived Taylor as disabled based on a mistaken interpretation of his medical records, specifically Dr. Moore's October 1995 physical capacity evaluation, wherein

_____

3. See supra note 1. The most direct evidence on this point comes from Dr. Moore's note to Cynthia Jackson, who apparently was in charge of authorizing Taylor's medical expenses for Pathmark's insurer. Dr. Moore requested that Taylor be authorized to visit a podiatrist for his ankle pain and wrote, "Hopefully, only conservative measures will be needed such as a brace or an orthotic." Taylor has identified no further evidence that such a visit was authorized or what came from it, and he testified that his need for an air cast was only occasional. Under these circumstances, we conclude that no material issue of fact exists about his medical need for an assistive device to stand for shorter periods.

11

the doctor checked the box marked "temporary" and the Committee responded with a letter stating "We have been advised your restrictions are permanent." The October 1995 evaluation, which occurred after Taylor temporarily aggravated his ankle, described severe limitations on many important activities such as lifting and walking, limits that were far greater than those imposed by Taylor's permanent ankle impairment. A reasonable jury could therefore conclude that Pathmark erroneously regarded him as disabled. As Taylor notes, the statement in Pathmark's May 1996 letter that he was unable to perform any Pathmark job, even with accommodation, suggests a perception of limits that would likely constitute substantial limitation on many major life activities. This is not a case where Pathmark stated that he was unable to perform a particular job; it appears to have considered him incapable of performing a wide range of jobs, indeed, any jobs that required significant standing, walking, lifting, or moving about (i.e., most jobs in a supermarket).

Several cases support our conclusion that, in general, an employer's perception that an employee cannot perform a wide range of jobs suffices to make out a "regarded as" claim. In Dipol v. New York City Transit Authority, 999 F. Supp. 309, 314 (E.D.N.Y. 1998), the court found that the plaintiff had proved a "regarded as" claim when, after receiving information from the plaintiff's doctor, the employer immediately placed the plaintiff on no-work status, excluding him from all jobs. In Coleman v. Keebler Co., 997 F. Supp. 1102, 1114 (N.D. Ind. 1998), the court held that evidence that the defendant concluded that the plaintiff could not perform any available jobs in a production plant created a material issue of fact on a "regarded as" claim. More generally, if an impairment at a certain level of severity would constitute a disability, then it follows that an employer who perceives an employee as having such an impairment perceives the employee as disabled. Cf. 29 C.F.R. pt. 1630 App., S 1630.2(j) ("An individual who has a bad back that prevents the individual from performing any heavy labor job would be substantially limited in the major life activity of working because the individual's impairment eliminates his or her ability to perform a class of jobs.").

12

The District Court, however, rejected Taylor's "regarded as" claim. The court reasoned:

> The thrust of Plaintiff's claim . . . is based on Defendant's failure to accommodate Plaintiff's physical impairment. Plaintiff asserts that based on Dr. Gelman's April 7th note, which stated that Plaintiff could work without restrictions, Defendant demanded on April 29, 1994 that Plaintiff perform the cashier's job. Plaintiff contends that he could not perform the cashier's job as requested because he was substantially limited in a major life activity and therefore disabled . . . . On the other hand, Plaintiff argues that he was wrongfully "regarded as" disabled by his employer with respect to him being employed in the frozen food manager's job, which Plaintiff asserts he could have done without any accommodation by the Defendant.
> . . .
>
> Essentially, the Plaintiff is asking the Defendant to treat him as disabled under the ADA if he is assigned to a job other than frozen food manager. In sum, when Plaintiff was initially injured, he provided his medical restrictions to the Defendant. Plaintiff worked for a period of fifteen months asserting these restrictions and Defendant accommodated him. Subsequently, when Defendant learned, from a doctor's note, that Plaintiff was purportedly no longer disabled, Defendant regarded Plaintiff as able, and requested that Plaintiff perform a job affording no accommodation for his impairment. Plaintiff then asserted that he was disabled. Plaintiff now claims that he was not disabled and should not have been regarded as such by the Defendant in the context of Plaintiff 's desire to be assigned as a frozen food manager.
>
> Plaintiff proposes an apparently impossible situation for an employer. On the one hand, an employer must acknowledge the medical restrictions needed by an employee, while on the other hand it must ignore those same medical restrictions when the employee believes the restrictions might affect his assignment to a desired position.

13

Slip op. at 14 (citations omitted).

We will first consider the District Court's reasoning about the conflicts between Taylor's two claims and the time frame of his "regarded as" claim, and then turn to a broader analysis of "regarded as" protection under the ADA.

A. Allegedly Inconsistent Claims

We conclude that this set of facts was insufficient to support a directed verdict for the defendant. The District Court concluded that Taylor was proffering both a theory that he was disabled and a theory that he was wrongly regarded as disabled, which theories undercut one another. However, a plaintiff may plead in the alternative, and our caselaw finds no difficulty with pairing the two claims in one complaint. In Olson v. General Electric Astrospace, 101 F.3d 947 (3d Cir. 1996), we expressed no discomfort in denying summary judgment on a "regarded as" claim where the plaintiff had also alleged actual disability, although "the evidence that was apparently offered to demonstrate [his] fitness as an employee ironically establishes that he was not substantially limited in a major life activity." Id. at 953. Similarly, in Arnold v. United Parcel Service, Inc., 136 F.3d 854, 860, 862 (1st Cir. 1998), the court held that there is no conflict in bringing an actual disability and a "regarded as" claim together. See also Koblosh v. Adelsick, No. 95C5209, 1996 U.S. Dist. LEXIS 17254, at *15 (N.D. Ill. Nov. 20, 1996) (same).

The possibility that a plaintiff will bring both an actual disability and a "regarded as" claim is simply one allowed by the law; its possible abuse must be checked by the standard measures for deterring frivolous or bad-faith complaints. Nor is Taylor's position intrinsically contradictory, as he could have an impairment (whether or not it rose to the level of a disability) that could actually be accommodated, despite Pathmark's perception that his disability was too severe to accommodate.

At all events, we disagree with the District Court's description of Taylor's claims. Taylor did not claim that he was "not disabled" with respect to the frozen food manager job, as the court suggested; he claimed that the job's requirements did not interact with his disability in a way

14

that prevented him from doing the job or that required accommodation (beyond allowing him to rest his leg on a milk crate from time to time, a measure that may not even technically be an accommodation and that we discuss further infra). The distinction is highlighted by the example of a deaf person who claims that he is qualified for a job that involves converting handwritten notes into word processing files: He would not be "not disabled" with respect to the job, because disability is not a job-specific determination, but the job would not be affected by his disability.

The District Court also believed that Taylor was putting Pathmark in an impossible situation because Pathmark would be potentially liable if it accommodated Taylor or if it refused to accommodate him. However, Pathmark would not be liable for accommodating Taylor. It is only liable if it wrongly regarded him as so disabled that he could not work and therefore denied him a job.

The accommodations that Pathmark provided or might have provided are not part of Taylor's "regarded as" claim. Taylor does not attempt to rely on Pathmark's pre-April 1994 accommodations of his condition to prove his "regarded as" claim, nor should he. An employer may decide to accommodate people who are not "disabled" under the ADA. If the District Court is concerned about the possibility of jury confusion on this issue, it might be appropriate to instruct the jury that Pathmark's voluntary accommodations, which are apparently formalized and routinized in Pathmark's employment manuals, are not evidence of a perception of disability.

B. The Time Frame of the "Regarded as" Claim

We agree with the District Court that Pathmark regarded Taylor as able to work on April 29, 1994, but that is not material to Taylor's "regarded as" claim. Taylor's claim is that Pathmark erroneously regarded him as entirely and permanently unable to work at any job after it received Dr. Moore's evaluation in September 1995; his "regarded as" claim must be limited to the period following that evaluation. Taylor claims that he was not, in fact, so disabled that he could not perform any Pathmark jobs.

15

Taylor notes that he provided Pathmark with a letter on December 19, 1995, that stated that his restrictions as of December 1995 were the same as they had been during the November 1992–April 1994 period when he was working at Pathmark. The temporary July to December 1995 restrictions had been lifted. A reasonable factfinder could conclude that Taylor was not so impaired that he could not work at all after that point, and therefore that Pathmark's misunderstanding of his condition prevented him from getting work at Pathmark for some period after December 19, 1995. Under this scenario, Taylor had a viable "regarded as" claim after that date.

C. Liability for Mistakes

What a "regarded as" plaintiff must do to put the employer on notice that its perception is erroneous is an extremely difficult question. Pathmark in effect argues that: (1) until Taylor provided definitive notice of his ability to work and corrected Pathmark's belief, it cannot be held liable for considering him unable to work; and (2) his provision of notice proves that Pathmark correctly understood his condition after that point. We deal with Pathmark's second claim infra Section III.E, while in this section we make clear that Pathmark has the initial responsibility to evaluate employees correctly.

Pathmark argues that reliance on information given by the plaintiff (or the plaintiff's agent) cannot found an ADA "regarded as" cause of action. As Pathmark puts it, "For as long [as] Dr. Moore's report led Pathmark to believe that Taylor required a sedentary position, Pathmark was entitled to act accordingly." Pathmark's broad assertion cannot carry the day under the peculiar facts of this case. In most "regarded as" cases, it is likely that information on an employee's abilities comes from the employee or his agent, but the source of the information will not necessarily be determinative. The fact is that Dr. Moore's report labelled Taylor's restrictions "temporary," not permanent. At all events, Taylor never provided Pathmark with the conclusion that he was substantially limited in a major life activity such that there were no jobs at Pathmark that he could perform, with or without accommodation. This case is dominated by miscommunications and misinterpretations,

16

and one of the points of "regarded as" protection is that employers cannot misinterpret information about an employee's limitations to conclude that the employee is incapable of performing a wide range of jobs.

We find the cases Pathmark cites on reasonable reliance to be inapposite. In Wooten v. Farmland Foods, 58 F.3d 382 (8th Cir. 1995), for example, the court held that the evidence of an employer's perception of an employee's abilities based on a doctor's note provided by the employee was insufficient to establish a "regarded as" claim. The court held that Wooten's employer's perceptions were not based on stereotype or myth but on a doctor's written restrictions. But the law in this circuit is that a"regarded as" plaintiff can make out a case if the employer is innocently wrong about the extent of his or her impairment:

> Although the legislative history indicates that Congress was concerned about eliminating society's myths, fears, stereotypes and prejudices with respect to the disabled, the EEOC's Regulations and Interpretive Guidelines make clear that even an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability. Thus whether or not [the defendant] was motivated by myth, fear or prejudice is not determinative of [the plaintiff 's] "regarded as" claim.

Deane, 142 F.3d at 144 (citation omitted).

Similarly, Riemer v. Illinois Department of Transportation, 148 F.3d 800 (7th Cir. 1998), sustained a "regarded as" claim where the employer's misperception about the effects of the plaintiff 's asthma, based on a doctor's report, led it to exclude the plaintiff from an entire class of jobs, and in Johnson v. American Chamber of Commerce Publishers, Inc., 108 F.3d 818 (7th Cir. 1997), the court wrote, "If for no reason whatsoever an employer regards a person as disabled--if, for example, because of a blunder in reading medical records, it imputes to him a heart condition he never had--and takes adverse action, it has violated the statute . . . ." Id. at 819; see also Dipol, 999 F. Supp. at 314

17

(the fact that the employer, after receiving information from a doctor, immediately placed the plaintiff on no-work status made out a "regarded as" claim); Mendez v. Gearan, 956 F. Supp. 1520, 1525 (N.D. Cal. 1997) (employer's mistaken perception that a temporary impairment was permanent could found a "regarded as" claim).4

We acknowledge the force of Pathmark's argument that it relied on information supplied by Taylor's doctor in concluding that it had no job available that met his restrictions during the period from October 1995 to December 1995 (Taylor informed Pathmark that the severe restrictions had been lifted on December 19). Taylor has not disputed that he did, in fact, have those temporarily heightened restrictions after the aggravation of his ankle injury. We conclude that a directed verdict as to that period was proper, because he has not disputed Pathmark's claim that restrictions of such severity precluded him from any Pathmark jobs, even with accommodation.

Pathmark further argues that it was reasonable to rely on Dr. Moore's first evaluation until June 1996, when Dr. Moore filled out an updated questionnaire.5 We cannot, however, say that Pathmark's reliance on Dr. Moore'sfirst report necessarily excuses it entirely from liability. An employer can rely on an employee's information about restrictions, but it has to be right when it decides that those restrictions are permanent and that they prevent the employee from performing a wide class of jobs, as opposed

_____

4. Dotson v. Electro-Wire Products, Inc., 890 F. Supp. 982 (D. Kan. 1995), another case cited by Pathmark, is distinguishable. In that case, the physician's note at issue did not describe an impairment that could reasonably be thought to substantially limit the plaintiff in a major life activity. On receipt, the defendant did not change the plaintiff 's job duties or take other actions to indicate that it considered her incapable of doing the general class of job. See id. at 991. In contrast, Pathmark sent Taylor a letter saying that his restrictions were permanent and that he was fired.

5. Pathmark characterizes this second questionnaire as a "changed" diagnosis. This is arguably a critical misdescription, since Taylor contends that Dr. Moore's restrictions were always temporary, as he indicated on the first form, and so the second form simply reflected the fact that the temporary restrictions had been lifted.

18

to one particular and limited job. An employer who simply, and erroneously, believes that a person is incapable of performing a particular job will not be liable under the ADA. Liability attaches only to a mistake that causes the employer to perceive the employee as disabled within the meaning of the ADA, i.e., a mistake that leads the employer to think that the employee is substantially limited in a major life activity.

Pathmark argues that imperfection in its internal procedures--apparently a communication gap between the ADA Committee and those responsible for making an employment decision about Taylor--should not lead to ADA liability. Yet if the relevant decisionmakers wrongly believed that Taylor was completely unable to work because of miscommunication within Pathmark, the ADA puts on Pathmark the burden of correcting the problem, rather than leaving Taylor out in the cold. Cf. Deane, 142 F.3d at 149 (suggesting that informal cooperation and communication to correct mistakes is appropriate in a "regarded as" situation). Taylor offered Pathmark updated information on his condition on December 19, 1995, and he had Dr. Moore send further information after he received Pathmark's May 1996 letter; therefore, we cannot say that he is unarguably responsible for the misunderstanding.

Except for the limited period noted above, judgment as a matter of law for Pathmark is inappropriate, because a reasonable jury could find that Taylor was not responsible for the error. In that case, Pathmark could be liable, even if its mistake were otherwise innocent. But on remand, Pathmark has a possible defense of reasonability, which we describe in greater detail in the next section.

D. A Limited Reasonability Defense

Because the ADA imposes extensive requirements on employers and covers a broad range of conditions, new puzzles seem to arise from every case. Deane announced our conclusion that employer mistakes can lead to "regarded as" liability. The question then becomes: What limits, if any, are there to this principle? There are no clear answers in our precedent, the statute, the legislative history, or the EEOC's interpretive guidelines. We must,

19

however, answer the question to resolve this case. We believe that guidance can be found in the general logic of the ADA, which requires an interactive relationship between employer and employee, and concomitantly requires an individualized evaluation of employees' impairments. See Taylor v. Phoenixville Sch. Dist., No. 98-1273, ___ F.3d ___, 1999 WL 184138 (3d Cir. Apr. 5, 1999).6

While prejudice is not required for a successful "regarded as" claim, we recognize that the ADA has as a major purpose the protection of individuals who are subject to stereotypes about their abilities. An employer who regards a kind of impairment--epilepsy, for example--as disqualifying all people affected by the impairment for a wide range of jobs is thus not entitled to a defense of reasonable mistake; under the ADA, it is the employer's burden to educate itself about the varying nature of impairments and to make individualized determinations about affected employees. However, there is no evidence in this case that Pathmark decisionmakers were infected with stereotypes or prejudice against the disabled. In situations such as this one, which do not involve prejudice, we think that a limited defense best serves the aims of the ADA: If the employer is factually mistaken about the extent of an employee's impairment, and the employee or his agent is responsible for the mistake, the employer is not liable under the ADA.7

_____

6. We are also influenced by the Supreme Court's decisions in Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Industries, Inc.
v. Ellerth, 524 U.S. 742 (1998). In those cases, the Court determined that general principles of agency law justified imposing Title VII liability
on employers for sexual harassment committed by supervisors, but defined an affirmative defense to liability in order to give employers incentives to create effective anti-harassment programs. The details of the defense were dictated by concerns for logic and equity, not by Title VII's explicit provisions. We take the same path here.

7. We note that it will not always be immediately clear whether a particular physician is an employee's agent. For example, whereas in Delaware, a worker seeking workers' compensation has a right to select an independent physician, see 19 Del. Code Ann. S 2323 (1998), the Pennsylvania Workers' Compensation Act allows an employer to establish a list of designated physicians or health care providers, and an

We emphasize that it is not reasonable for an employer to extrapolate from information provided by an employee based on stereotypes or fears about the disabled, and we think that the distinction between the effects of a type of impairment and an impairment's extent adequately captures the distinction: A belief that anyone with bipolar disorder or HIV infection is substantially limited in a major life activity is a conclusion about the effects of the impairment and only secondarily about the particular employee. An employer with such a belief is failing to make an individualized determination, as the ADA requires, and thus acts at its peril. If an employer believes that a perceived disability inherently precludes successful performance of the essential functions of a job, with or without accommodation, the employer must be correct about the affected employee's ability to perform the job in order to avoid liability; there is no defense of reasonable mistake. Any other outcome would defeat the ADA's attempt to eradicate what may be deeply rooted and seemingly rational presumptions about the abilities of the disabled.

By contrast, a mistake about the extent of a particular employee's impairment made in the course of an individualized determination is further from the core of the ADA's concern, and a reasonability defense adequately protects employees' interests in not being erroneously regarded as disabled. We reaffirm that an employer is liable for mistakenly regarding an employee as disabled, unless the employer's perception is based on the employee's

_____

employee may be required to visit one of those on the list in order to maintain a workers' compensation claim, see 77 Pa. Stat. Ann. S 531(1)(I) (1998). An employer's employment, ownership, or control of such physicians or health care providers must be disclosed in order for them to be placed on the list. Even if the providers on the list are independent, if the employer designates them and relies on their judgments, the onus may well be on the employer, rather than the employee, to correct their mistakes. It is also possible that the list will consist of independent providers negotiated by the employees' labor union and the employer. See 77 Pa. Stat. Ann. S 1000.6(a)(3) (1998). We express no opinion on all these agency issues, which are not present here and will have to be resolved on a case-by-case basis.

21

unreasonable actions or omissions. The limited exception to liability for mistakes can be expressed as follows: If an employer regards a plaintiff as disabled based on a mistake in an individualized determination of the employee's actual condition rather than on a belief about the effects of the kind of impairment the employer regarded the employee as having, then the employer will have a defense if the employee unreasonably failed to inform the employer of the actual situation.8

This rule is consistent with our decision in Deane, in which we emphasized the employer's failure to take reasonable steps to learn the true extent of the plaintiff 's impairment. See Deane, 142 F.3d at 145. In Deane, we found a genuine issue of material fact as to whether the plaintiff had been perceived as disabled where the record documented confusion among the relevant decisionmakers as to the extent of the plaintiff 's physical impairment. See Deane, 142 F.3d at 145. Pathmark attempts to distinguish Deane by noting that the defendants in that case relied on a short phone conversation with the plaintiff to conclude that she could not perform any available job. The Deane court noted that the defendants did not evaluate the plaintiff, contact her physician, or independently review her medical records, but relied on one phone conversation with her. See Deane, 142 F.3d at 145. By contrast, Pathmark relied on Dr. Moore's medical report.

The Deane facts do not define the outer limits of liability. Pathmark apparently made a significant error in treating

_____

8. We recognize that there is a continuum of perceptions and that there will be difficult cases, but we think that our formulation provides appropriate guidance. For example, an employer who is informed that a particular individual has epilepsy might overestimate the limiting effects of that individual's epilepsy because of a general perception about the severity of epilepsy. If the employer mistakenly overestimates the degree of a person's impairment based on perceptions about the nature of the impairment, it is not basing its decision on an individualized evaluation. Moreover, the employer's defense would fail in such a case because the employee would have done nothing unreasonable in informing the employer of her condition. The employer should seek further specific information about the extent of the employee's impairment before it concludes that the employee is disabled.

22

Taylor's temporary restrictions as permanent. Taylor also offered evidence that Pathmark did not engage in a process of communication and cooperation, as we counseled employers to do in Deane. See id. at 149.9 Additionally, Pathmark argues that Taylor acted unreasonably under the circumstances: He waited until after the ADA Committee made its decision to have his doctor submit a new report. However, Taylor did not know until the May letter that Pathmark considered him permanently unable to work, and he did communicate with Pathmark in December 1995, approximately five months before he was fired, about his reduced restrictions.

While Pathmark argues that Taylor bears the "lion's share" of responsibility for any miscommunication that occurred, there is evidence to the contrary. Taylor appears to have consistently sought reinstatement. Pathmark's own electronic mail suggests that his saga included "glitches." Pathmark waited approximately seven months after the ADA Committee considered his case to send him notice that he was terminated, apparently because of an often-postponed meeting of counsel. The ADA Committee itself did not meet on Taylor's case for one year after Pathmark's doctor last examined him, which constitutes a significant delay. Moreover, the record reflects that an outside consultant advised Pathmark that "sharp disparities" between Taylor's self-report and Dr. Moore's evaluation led her to "strongly advise that an attempt be made to resolve the discrepancies."

While there are no fixed rules for what an ADA plaintiff must do to correct an employer's expressed misperception, we think that a jury could find that Taylor did not act unreasonably in these circumstances and that Pathmark was responsible for the misunderstanding. Reasonability is

_____

9. Pathmark also seeks to distinguish Deane by noting that there was a factual dispute in that case as to whether lifting was an essential function of the job, and there is no such dispute here. But that question goes to a totally different element of the plaintiff 's case, which is whether the plaintiff is qualified to perform the essential functions of the
job. Taylor is not saying that Pathmark was wrong about the job description; he is arguing that Pathmark was wrong about him, at least after December 1995.

a fact-specific test, and, of course, the employee must have reason to know of the basis of the employer's decision before he can unreasonably fail to correct a mistake. This rule will encourage communication between employer and employee, in the same way that the interactive process for determining reasonable accommodations does. See Taylor, ___ F.3d at ___ (discussing the requirements of the interactive process).

E. Actual Causation

Pathmark argues that it never regarded Taylor as disabled. It states that, when Dr. Moore gave it updated information in June 1996, it then understood that Taylor's restrictions were no longer as serious as they had previously been. Arguably, Pathmark simply decided not to take Taylor back, even knowing that he could work, until July 1997.10

Taylor responds that we cannot simply take Pathmark's word that it knew he was not disabled but refused to act on that information, since Taylor was never privy to its "secret thought processes." In this posture, Taylor's argument is persuasive. If we were to accept Pathmark's argument, a plaintiff 's attempts to disabuse an employer's misperceptions about his disability could be used to eviscerate a "regarded as" claim; this would encourage potential plaintiffs to avoid communicating with employers and begin litigation that might otherwise be avoided. Particularly given the reasonability defense set forth in the previous section, we think that Pathmark cannot rely solely on Taylor's communications with it to prove that Pathmark did not regard him as disabled after June 1996.

We note in this regard that the lack of internal communication, to which Pathmark appeals when asking us to excuse its reliance in 1994 on the various conflicting doctors' notes, could also have left Pathmark with a

_____

10. If the contention were that Pathmark used Taylor's disability as a pretext for ridding itself of an employee with seniority under the union collective bargaining agreeement, Taylor would not have a successful claim that he was regarded as disabled. The ADA prohibits discrimination, not action taken using discrimination as a pretext.

24

continuing erroneous belief about Taylor. The ADA
Committee, by its member's own testimony, never learned
why Taylor was not accommodated and rehired, and a
reasonable jury could conclude that the relevant Pathmark
decisionmakers--apparently Pathmark counsel, in this case
--continued to regard Taylor as disabled.

F. Remaining Issues

Pathmark also argues that Taylor never proved that there
was a job that he could do that was open during the
relevant time period. As Pathmark points out, it has no
duty to create a special job for a disabled person. See
EEOC Technical Assistance Manual at 90.0530 (an
employer is not required to create a new job or bump an
employee from an existing job as a reasonable
accommodation); cf. Shiring v. Runyon, 90 F.3d 827 (3d Cir.
1996) (reaching the same result under the functionally
identical Rehabilitation Act). Specifically, Pathmark argues
that Taylor never proved that there was an available frozen
food manager position during the relevant period; his old
job was filled before he returned in 1992, and nothing in
the record shows that there was a vacancy thereafter.
Unless there was a frozen food vacancy, Pathmark
persuasively reasons, there can be no causal connection
between Pathmark's perception of Taylor's abilities and its
failure to give him the frozen food job. Taylor responds that
he did not pursue the frozen food job more aggressively
because his union representative was told that he was
going to be put back to work. This is an issue of fact to be
resolved on remand.

Taylor also suggests that he would have wanted to be
considered for a cashier job, and there apparently were
cashier vacancies for which the ADA Committee could have
considered him. Pathmark's own ADA manuals suggested
that cashier jobs did not require extended walking and
standing. Furthermore, under the ADA the employer may
be required to participate with a covered employee to
identify a vacant position that the employee can perform, as
employees may otherwise lack the ability to identify such
positions. See Taylor, ___ F.3d at ___, slip op. at 35-36;
Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997).
Therefore, there is at least a genuine and material issue as

25

to whether Pathmark would have had a position for Taylor in 1996.

If Taylor prevails, the District Court might have to decide in the first instance whether a "regarded as" plaintiff is entitled to accommodation even though he is not disabled. We have yet to resolve this issue. On the one hand, the statute does not appear to distinguish between disabled and "regarded as" individuals in requiring accommodation. On the other, it seems odd to give an impaired but not disabled person a windfall because of her employer's erroneous perception of disability, when other impaired but not disabled people are not entitled to accommodation. See Deane, 142 F.3d at 149 n.12.

The debate over accommodation has heretofore focused on what constitutes a "reasonable accommodation," not on the definition of "accommodation" vel non. In its natural meaning, an "accommodation" would seem to be some change in the way the employer normally requires or allows the job to be done.11 If the employer routinely allows employees to perform a job in one of several ways and an employee chooses one of those ways, perhaps in order to alleviate an impairment that does not rise to the level of a disability, then there would not seem to be any "accommodation" involved.

In this case, the requested "accommodation" is the use of a milk crate to sit on while stocking lower shelves. This may or may not be a true accommodation, and it might therefore be unnecessary to reach the difficult question of entitlement to accommodation. See App. at A256 (vocational rehabilitation specialist testified that "I believe there would be little or no real accommodation necessary"

_____

11. Webster's Third New International Dictionary defines "accommodation" as, inter alia, "something that is supplied for convenience or to satisfy a need," "the provision of what is needed or desired for convenience," or "adaptation, adjustment." Webster's Third New International Dictionary 12 (1966). The last definition seems most appropriate to the context of the ADA. None of these definitions would make the standard conditions of a workplace "accommodations," as preexisting conditions or practices would not be "supplied" or "provided" to take account of an employee's disability.

for the frozen food job); id. at A257-58 (reaching the same conclusion about stock jobs). Pathmark's representative testified that use of a milk crate created "safety issues," but this was called into question on cross-examination, and Taylor testified that he used a milk crate to do his job for fourteen months without objection from Pathmark. Moreover, Taylor's expert, Yohe, testified that the use of milk crates was standard in supermarket stocking generally. There is thus a material issue of fact as to whether use of a milk crate was a standard way to perform stocking duties at Pathmark.

Furthermore, even if use of a milk crate is an accommodation and Taylor is not entitled to accommodation, he may well be entitled to other forms of relief, such as injunctive relief and damages, as well as attorney's fees, and so the accommodation question is not critical to the success of his claim. See Deane, 142 F.3d at 149 n.12.

IV. Conclusion

This factually complex case presents us with novel issues under what may be the most difficult part of a difficult statute. Adhering to our precedent that mistakes may lead to liability under the ADA, we hold that, in this case, a jury could find Pathmark responsible for its mistaken impression of Taylor's abilities, and that a jury could also find a causal link between Pathmark's mistake and its failure to rehire Taylor in one of his former positions. However, Taylor does not suffer from an actual disability.

For the foregoing reasons, we will affirm the judgment of the District Court on Taylor's actual disability claim, affirm it on Taylor's "regarded as" claim from September 1995 to December 19, 1995, and reverse it on the "regarded as" claim for the period following December 19, 1995.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

27