**Audrey JACQUES, Plaintiff,**

v.

**DiMARZIO, INC., Defendant.**

**No. 97–CV–2884 (FB).**

United States District Court,
E.D. New York.

Feb. 27, 2002.

Supplemental Decision May 6, 2002.

Lisa Sirkin, Minna Kotkin, Stephen Meyer, Legal Intern, Harmon Fields, Legal Intern, BLS Legal Services Corp., Brooklyn, NY, for Plaintiff.

Gary Ettelman, Ettelman & Hochheiser, P.C., Garden City, NY, for Defendant.

### MEMORANDUM & ORDER

BLOCK, District Judge.

Plaintiff, Audrey Jacques ("Jacques"), brings this action against her former employer, defendant DiMarzio, Inc. ("DiMarzio"), alleging violations of the Americans with Disabilities Act ("ADA") and New York Labor Law § 215. DiMarzio filed a counterclaim seeking $500,000 in damages. DiMarzio moves for summary judgment. Because the Court concludes that issues of material fact exist with respect to Jacques's claim that she was regarded as disabled, the motion is denied. In respect to the counterclaim, the Court *sua sponte* raises the issue of whether the counterclaim should be dismissed, and whether sanctions should be imposed against DiMarzio pursuant to Federal Rule of Civil Procedure 11.

## BACKGROUND

The following facts, which are largely taken from Jacques's submissions, are undisputed: In October 1989, DiMarzio hired Jacques to work as a packager and assembler of electronic guitar components in its factory. During her employment with DiMarzio, Jacques received average to above-average evaluations. Jacques remained employed with DiMarzio until September 11, 1996, when she was terminated for her "confrontational and irrational behavior with her supervisor" and her "incessant conflict with her fellow employees[.]" Jacques Aff., Ex. 8 at 11–12.

### 1. Jacques's Mental Impairment

Jacques claims to have "a long history of psychiatric problems, going back to [her] teenage years when [she first suffered] severe and major depressions." Jacques Aff. ¶ 7. Jacques suffers from Bipolar II Disorder ("bipolar disorder") and Major Depressive Disorder. Tricarico Aff. ¶ 3. Treatment for her emotional problems began in the 1960s, and extended throughout the 1970s and 1980s with inpatient and outpatient treatment. According to Jacques's psychiatrist, her mental disorders produce "a chronic pattern of unpredictable mood episodes and fluctuating unreliable interpersonal and/or occupational functioning." Id. at ¶ 6. Her symptoms include "mood swings, irritability, apathy, poor judgment and denial." Id. at ¶ 7. Jacques claims that her conflicts at work were a product of her bipolar disorder.

In December 1991, while in a period of depression, Jacques suffered from uterine hemorrhaging. She refused to have surgery to correct the problem. Her psychiatrist attributed Jacques's opposition to surgery to her bipolar disorder. Id. at ¶ 4. Jacques's uterine hemorrhaging caused her to work at DiMarzio only "periodically" for the next few months. Jacques Aff.

¶ 10. In February 1992, Jacques took a two-week leave of absence to recover from her medical problems. Jacques claims to have told her supervisors during this leave about her depression and that she was taking the anti-depressant Prozac. Id. at ¶ 11.

In 1994, a minor car accident triggered an "anxiety reaction" that left Jacques "fearful of going anywhere" by herself for six months. Id. at ¶ 13. In 1995, her mother's illness caused Jacques to feel "more seriously depressed." Id. at ¶ 14. On January 23, 1995, Jacques requested and received a month's leave from work "[d]ue to the serious medical condition of [her] mother...." Id. Ex. 7.

### 2. Jacques's Health and Safety Concerns at DiMarzio

Jacques expressed concerns about health and safety conditions at the DiMarzio factory to her supervisors from 1990 to 1996. She was concerned about the dangers of solder and flux, glue, fumes, inadequate ventilation, and the absence of safety glasses when other workers from DiMarzio did extra work at home, known as Industrial Homework ("Homework"), as a means of supplementing their incomes. In 1995, Jacques confronted a supervisor, Michael Altilio ("Altilio"), about the dangers of flux. "From the beginning of 1996," Jacques "noticed that health and safety conditions seemed to worsen. As a result [her] complaints increased [until her] termination...." Jacques Aff. ¶ 22.

On March 15 and 16, 1996, Jacques was working in a poorly ventilated factory room. After working in the room for a day and a half, Jacques developed "severe headaches, blurred vision, nasal congestion, and nausea." Id. at ¶ 25. She sought treatment for her symptoms at the Emergency Room at University Hospital in Staten Island, where she was treated and

released. Jacques reported this incident to Altilio and stated her concern about the lack of ventilation. Altilio said nothing and walked away.

In April 1996, Jacques approached another supervisor, Elizabeth Capostoso, to request Homework. Ms. Capostoso refused, citing Jacques's physical reaction to the solder fumes. In May 1996, Jacques approached Altilio, again requesting Homework. Altilio also refused, citing safety concerns and the inability to supervise Jacques's Homework.

In July 1996, Jacques began asking other workers taking Homework if they had been given safety and insurance guidelines about their Homework. Jacques learned that they had not. On August 27, 1996, Jacques confronted Altilio "with the fact that it [is] a state law for workers doing soldering to wear safety goggles, and [that] those workers soldering for ... Homework were not being supervised and were not taking their safety goggles home." *Id.* at ¶ 34. Again, Altilio did not respond.

### 3. Termination of Jacques's Employment and Litigation Aftermath

On August 30, 1996, Jacques was told by Altilio that, due to her ongoing conflicts with other workers, he wanted her to work at home, performing the same guitar assembly tasks she did at the factory. On September 11, 1996, after a number of other conversations, including one where Altilio suggested that Jacques "needed help and should see a psychiatrist," *id.* at ¶ 43, Altilio called Jacques at home to inform her that Larry DiMarzio, the owner of the company, had decided to terminate her employment.

On October 23, 1996, Jacques filed a complaint against DiMarzio with the United States National Labor Relations Board ("NLRB"), alleging that she was dis-

charged in violation of the National Labor Relations Act ("NLRA"). On January 15, 1997, after an investigation of Jacques's charges, the NLRB issued a decision finding no violation of the NLRA. On March 10, 1997, Jacques unsuccessfully appealed to the Office of the General Counsel of the NLRB.

On February 14, 1997, Jacques filed a complaint with the New York State Division of Human Rights ("NYSDHR"), claiming that DiMarzio discriminated against her based on a disability in violation of the New York State Human Rights Law. On August 18, 1998, after an investigation, the NYSDHR issued a determination dismissing Jacques's complaint without comment.

On April 16, 1997, Jacques filed a Notice of Charge of Discrimination against DiMarzio with the Equal Employment Opportunity Commission ("EEOC"). Jacques claimed that she was terminated in violation of the ADA. On May 6, 1997, the EEOC issued a Right to Sue letter.

On May 20, 1997, Jacques commenced this action under the ADA, claiming that she was fired because of her bipolar disorder and because of her complaints about DiMarzio's safety and health violations. In its answer, which takes issue with whether Jacques was disabled within the meaning of the ADA and whether she was fired for her complaints, DiMarzio asserts a counterclaim seeking $500,000 in damages for harassment, interference with "business operations" and "employee morale", and damage to DiMarzio's reputation, all caused by Jacques's claims. Answer and Countercl. at ¶ 22.

### DISCUSSION

Summary judgment must be entered when "there is no genuine issue as to any material fact and ... the moving party is

entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, "the [C]ourt must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Summary judgment "is properly granted only when no rational finder of fact could find in favor of the non-moving party." *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir. 2000). "[T]he moving party bears the initial burden of establishing that there are no genuine issues of material fact[;] once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The non-movant must do more than show "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It cannot rely solely on the pleadings, but must produce "significant probative evidence tending to support the complaint." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**I. ADA Claim**

"The ADA prohibits discrimination against any 'qualified individual with a disability because of the disability of such individual in regard to,' *inter alia,* 'discharge of employees.'" *Giordano v. City of New York,* 274 F.3d 740, 747 (2d Cir.2001). An employee alleging employment discrimination under the ADA bears the initial burden of establishing a *prima facie* case. *See Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 332 (2d Cir.2000); *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869–70 (2d Cir.1998). In order to establish a *prima facie* case, the employee must demonstrate that: "(1) [her] employer is subject to the ADA; (2)[s]he was disabled within the meaning of the ADA; (3)[s]he was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4)[s]he suffered adverse employment action because of [her] disability." *Giordano,* 274 F.3d at 747. DiMarzio concedes that it is a covered entity under the ADA.

Under the ADA, a disability is:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment

42 U.S.C. § 12102(2).

**1. Disability**

**A. § 12102(2)(A)**

The Supreme Court has established a three-step approach to analyzing a claim under § 12102(2)(A). First, the Court must determine whether a condition is an impairment; second, the Court must identify the major life activity the plaintiff relies upon; third, the Court must determine whether the impairment substantially limits the major life activity. *See Bragdon v. Abbott,* 524 U.S. 624, 630–31, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). Jacques claims that she is disabled because her bipolar disorder "substantially limits her

ability to care for herself." Jacques Br. at 14.[1]

■ DiMarzio concedes that " 'there is little doubt that [b]ipolar [d]isorder can constitute an impairment.' " DiMarzio Reply Br. at 2 (quoting *Horwitz v. J.G. Stickley, Inc.*, 122 F.Supp.2d 350, 353 (N.D.N.Y. 2000) (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir.1999))); *see also Whalley v. Reliance Group Holdings, Inc.*, No. 97 CV 4018, 2001 WL 55726, at *4 (S.D.N.Y. Jan. 22, 2001) (finding that bipolar disorder constitutes an impairment under ADA). However, "[m]erely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 690, 151 L.Ed.2d 615 (2002). Claimants must demonstrate that the impairment substantially limits a major life activity. *See id.* Examples of "major life activities" include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Sutton v. United Air Lines*, 527 U.S. 471, 480, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (quoting EEOC regulation 29 C.F.R. § 1630.2(i)) (internal quotation marks omitted). "Caring for oneself" encompasses the normal, quotidian activities of daily living, including feeding oneself, driving, grooming, and cleaning one's home. *See Ryan*, 135 F.3d at 871–72 (citing *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir.1995)).

"The determination of whether an individual is substantially limited in a major life activity must be made on a case-by-case basis." *Toyota*, 122 S.Ct. at 685 (internal quotation marks omitted). "The determination . . . is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." *Id.* at 692 (internal quotation marks omitted).

According to ADA regulations, "substantially limited" means "[u]nable to perform a major life activity that the average person in the general population can perform; or significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Id.* at 690 (quoting 29 C.F.R. § 1630.2(j)) (internal quotation marks omitted); *see also id.* (holding that "to be substantially limited in [the major life activity of] performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives").

The plaintiff must show that she was " 'substantially limited during . . . the time span when she [was hired and fired by the defendant].' " *Horwitz*, 122 F.Supp.2d at 355 (quoting *Taylor*, 184 F.3d at 308). The regulations further counsel that "the following factors should be considered in determining whether an individual is substantially limited in a major life activity: (i)[t]he nature and severity of the impairment; (ii)[t]he duration and expected duration of the impairment; and (iii)[t]he permanent or long term impact of or resulting from the impairment." *Ryan*, 135 F.3d at 870 (quoting 29 C.F.R. § 1630.2(j)(2)).

■ Jacques fails to present sufficient evidence of how her impairment substantially limited her ability to take care of

---

1. The Court notes that Jacques does not claim that she is substantially limited in the major life activity of working. At her deposition, Jacques testified that her "mental problem doesn't affect [her] from working at all." Jacques Dep. at 119.

herself. Although Jacques has submitted an affidavit, in large part it simply states the general symptoms of bipolar disorder and the circumstances of her termination. The only part of the affidavit that specifically addresses her ability to care for herself is her statement that, in 1994, she was involved in a "minor" car accident "that ... triggered an anxiety reaction strong enough to make [her] fearful of going anywhere by [herself]." Due to this "anxiety reaction," Jacques "had to rely on [her] husband and son to get [her] to work and back and go with [her] on daily errands such as food shopping and doctor appointments. [Her symptoms] began to lessen after about six months." Jacques Aff. at ¶ 13. The "anxiety reaction" was temporary, and Jacques does not claim that she had any "anxiety reaction" at any other time during her employment with DiMarzio. Although her impairment may have affected her ability to drive and perform some errands for "about six months" during 1994, the Court concludes that, under the regulatory factors, the severity and duration of her limitation were not substantial. *See Ryan*, 135 F.3d at 872 (finding no substantial limitation where impairment limited plaintiff's ability to care for herself "only periodically"); *see also id.* at 871–72 (finding that plaintiff was not substantially limited in her ability to care for herself where she was "still able to get dressed, groom herself and make her way to work"); *Dutcher*, 53 F.3d at 726 (finding that plaintiff was not substantially limited in her ability to care for herself where she could "feed herself, drive a car, attend her grooming, carry groceries, wash dishes, vacuum, and pick up trash"); *Hatfield v. Quantum Chem. Corp.*, 920 F.Supp. 108, 110 (S.D.Tex.1996) (finding that plaintiff was not substantially limited in his ability to care for himself where he could groom himself, drive, socialize with friends, and clean his house); *cf. Toyota*, 122 S.Ct. at

694 (finding claimant not substantially limited in her ability to perform manual tasks where, according to plaintiff's deposition testimony, "she could still brush her teeth, wash her face, bathe, tend her flower garden, fix breakfast, do laundry, and pick up around the house").

This conclusion is reinforced by Jacques's deposition testimony that her mental condition did not affect her ability to take care of her home, to have a normal social life, or to attend to her personal hygiene:

Q: So from 1992 ... until the time you were terminated, was there ever a period of time that the mental problems interfered with your ability to otherwise function outside of work?

A: Outside of work?

Q: Right, outside of work. In other words, did it interfere with your ability to have a normal social life?

A: My mental condition or medical?

Q: Mental between 1992 and 1996.

A: I don't think so.

Q: During that period of time, were you always able to take care of your home?

A: From 1992 to 1996?

Q: Yes.

A: Most times, yeah, it didn't interfere with me taking care of my home.

Q: Or yourself, personal hygiene?

A: Oh, no. Absolutely not.

Jacques Dep. at 56–57.

In her brief, Jacques attempts to create an issue of fact by arguing that her deposition testimony is not credible because she "tends to minimize her symptoms" and has "difficulty perceiving the severity of the manifestations of her illness." Jacques Br. at 18 (citing Tricarico Aff. at ¶ 8). However, " '[t]he rule is well-settled in this circuit that a party may not, in order to defeat a

summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior testimony.'" *Nweke v. Prudential Ins. Co. of Am.,* 25 F.Supp.2d 203, 227 (S.D.N.Y.1998) (quoting *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572–73 (2d Cir.1991)); *see also Palazzo v. Corio,* 232 F.3d 38, 43 (2d Cir.2000) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not genuine issues for trial.") (internal quotations marks omitted).

### B. § 12102(2)(B)

Jacques argues that she has "a record of disability that substantially limits one or more of her major life activities." Jacques Br. at 19. Notably, Jacques does not set forth the specific major life activity she relies on for her § 12102(2)(B) claim. Giving Jacques's claim the most favorable reading, the Court assumes that she relies on either the same major life activity that she does in her § 12102(2)(A) claim, ability to care for herself, or the major life activity of working.

An employee can show that she has a disability within the meaning of the ADA under § 12102(2)(B) "if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment.... The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities.... The record must be one that shows an impairment that satisfies the ADA; a record reflecting a plaintiff's classification as disabled for other purposes or under other standards is not enough." *Colwell v. Suf-*

folk County Police Dept., 158 F.3d 635, 645 (2d Cir.1998) (citations omitted).

■ For reasons similar to those stated in rejecting Jacques's § 12102(2)(A) claim, her leaves for her uterine hemorrhaging and subsequent depression, and for her mother's illness, along with her psychiatric treatment and 1994 "anxiety reaction," do not suffice to establish a record that her impairment created a substantial limitation of her ability to care for herself. Her record also fails to establish that she was substantially limited in her ability to work. *See id.* (holding that employee's seven-month impairment of his ability to work, where he spent six months hospitalized, was "too short a duration and too vague an extent to be 'substantially limiting' "); *Sanders v. Arneson Prod.,* 91 F.3d 1351, 1354 (9th Cir.1996) (holding that three and one-half month impairment with minimal residual effects was not substantially limiting); *Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 200 (4th Cir.1997) (two-month impairment not substantially limiting); *see also* 29 C.F.R. Pt.1630 App., § 1630.2(j) (noting that "temporary, non-chronic impairments of short duration, with little or no long term permanent impact, are usually not disabilities"). Accordingly, the Court concludes Jacques has failed to make out a *prima facie* case that she had a record of a disability under the ADA.

### C. § 12102(2)(C)

Jacques argues that even if she is not actually disabled or does not have a record of a disability under the ADA, DiMarzio fired her because she was "regarded ... as having a mental disability that substantially limited her ability to interact with others." Jacques Br. at 20.[2] Under § 12102(2)(C), "the decisive issue is the

---

**2.** The Court notes that Jacques does not claim that DiMarzio regarded her as disabled from working.

employer's *perception* of his or her employee's alleged impairment." *Giordano*, 274 F.3d at 748. To sustain this claim, Jacques "must show not only that the defendant[ ] regarded [her] as somehow disabled, but that [it] regarded [her] as disabled *within the meaning of the ADA." Id.* "In *Sutton*, the Supreme Court explained that an employee can be 'regarded as' disabled in two ways: '(1) a covered entity mistakenly believes that a person has a[n] ... impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.' " *Id.* (quoting *Sutton*, 527 U.S. at 489, 119 S.Ct. 2139).

Here, Jacques's allegations fall within the second *Sutton* category. The decisive issue is whether Jacques has offered evidence to support the allegation that DiMarzio regarded her as disabled from interacting with others. *Id.* She cites DiMarzio's letter to the NLRB, which states:

> We had to tiptoe around for fear of somehow setting her off and causing her to blow up on us. Her behavior was sometimes *extremely emotional,* bordering on the irrational, and we took great pains to work with her in a way that she would remain calm. In this respect—treating her with kid[ ] gloves—she received extra-special treatment that we extended to no other employees. We had to deal with her as if she was emotionally disturbed.

Jacques Aff. Ex. 8 at 7.

The Second Circuit has not addressed the question of whether the ability to interact or get along with others is a major life activity. Other circuits are split on the question. *Compare McAlindin v. County of San Diego*, 192 F.3d 1226, 1235 (9th Cir.1999) (holding that "interacting with others" is a major life activity) *with Davis v. Univ. of N. Carolina*, 263 F.3d 95, 101 n. 4 (4th Cir.2001) (expressing "some doubt" as to whether "ability to get along with others" is a major life activity) *and Amir v. St. Louis Univ.*, 184 F.3d 1017, 1027 (8th Cir.1999) (noting that "it is questionable" whether "ability to get along with others" is a major life activity) *and Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 15 (1st Cir.1997) (suggesting that "ability to get along with others" is not a major life activity; "[t]he concept of 'ability to get along with others' is remarkably elastic, perhaps so much as to make it unworkable as a definition"); *see also Steele v. Thiokol Corp.*, 241 F.3d 1248, 1255 (10th Cir.2001) (assuming, without deciding, that "ability to get along with others" is a major life activity; applying *McAlindin* analysis).

■ The Court agrees with the Ninth Circuit's conclusion in *McAlindin* that the ability to "interact with others" is a major life activity: "[I]nteracting with others is an essential, regular function, like walking and breathing[;] it falls easily within the definition of 'major life activity.' " *McAlindin*, 192 F.3d at 1234. The ability to interact with others, like other recognized major life activities, is a basic function, necessary for daily human existence. Further, as the *McAlindin* court noted in response to the First Circuit's suggestion that the ability to get along with others was overly vague, "interacting with others is no more vague than 'caring for oneself,' which has been widely recognized as a major life activity." *Id.*

However, in *McAlindin* the Ninth Circuit quite properly noted that "[m]ere trouble getting along with coworkers is not sufficient to show a substantial limitation." *McAlindin*, 192 F.3d at 1235; *see also Steele*, 241 F.3d at 1255. Merely "cantankerous" persons will not be deemed sub-

stantially limited in the major life activity of interacting with others. *McAlindin,* 192 F.3d at 1235. The *McAlindin* court held, therefore, that in order to demonstrate that a plaintiff's major life activity of interacting with others was substantially affected, "a plaintiff must show that his 'relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary.'" *Id.* (quoting EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities (March 25, 1997) at 5); *see also Steele,* 241 F.3d at 1255 (applying *McAlindin* standard). The Court embraces this standard.

█ Jacques has provided sufficient evidence to establish a *prima facie* case under § 12102(2)(C). The letter from DiMarzio shows that DiMarzio perceived Jacques as beyond merely "cantankerous"; she was perceived as an "extremely emotional" and "irrational" individual. The letter, coupled with DiMarzio's knowledge of Jacques's mental impairment and Altilio's suggestion that Jacques should see a psychiatrist, is sufficient to create a triable issue of fact as to whether DiMarzio regarded Jacques as having "severe problems" "on a regular basis" in her "relations with others . . . ." *McAlindin,* 192 F.3d at 1235 (internal quotation marks omitted).

## 2. Reasonable Accommodation

Having established that a genuine issue of material fact exists with respect to the existence of a disability under § 12102(C), the Court turns to the issue of reasonable accommodation. Jacques argues that she was able to perform the essential functions of her job without accommodation. Jacques cites her seven years of employment with DiMarzio, her employee evaluations, and the opinion of a supervisor, who considered Jacques to be a skilled and valuable employee at the time she was fired. The Court concludes that there exists an issue of fact as to whether Jacques could perform the job without accommodation.

Jacques argues, alternatively, that DiMarzio denied her a reasonable accommodation when it failed to allow her to continue to work at home or in "a more enclosed work space" in the factory. Jacques Br. at 22 n. 5. An employer violates the ADA when it fails to "mak[e] reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship . . . ." 42 U.S.C. § 12112(b)(5)(A); *see also Jackan v. New York State Dept. of Labor,* 205 F.3d 562, 566 (2d Cir.2000). ADA regulations further state that an employer is required to make " '[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position.'" *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 217 (2d Cir.2001) (quoting 29 C.F.R. § 1630.2(*o*)(1)(ii)).

Here, DiMarzio neither argues nor presents evidence that allowing Jacques to continue to work at home or in a more isolated space in the factory would impose an undue hardship upon its business. The Court concludes that there is a triable issue of fact as to whether Jacques could perform her job with a reasonable accommodation.

## 3. Adverse Employment Action

The behavior cited as cause for Jacques's dismissal, *see* Jacques Aff., Ex. 8 at 11–12, is the very behavior that caused

DiMarzio to regard Jacques as having severe problems interacting with others. Because DiMarzio's perception of Jacques's behavior was inextricably bound up with its perception of her as disabled, Jacques has established that there exists a triable issue of fact as to whether she was fired because of her perceived disability.

In sum, the factual issues that remain for trial on Jacques's ADA claim are those issues related to whether Jacques was regarded as disabled under § 12102(C), whether she was qualified to perform her job with or without reasonable accommodation, and whether she suffered an adverse employment action due to her perceived disability.

## II. Remaining Claims

### A. Jacques's State Claim

■ In order to establish a violation of New York Labor Law § 215, Jacques must show that she complained to DiMarzio about its violations of the Labor Law and that she was terminated because of her complaints. "Under [§ ] 215, an employer is prohibited from discharging, penalizing, or in any other manner discriminating against an employee because the employee has complained to the employer … about a violation of labor law." *Warden v. E.R. Squibb & Sons, Inc.*, 840 F.Supp. 203, 208 (E.D.N.Y.1993); *see also Murphy v. Am. Home Prod. Corp.*, 58 N.Y.2d 293, 302 n. 1, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983). Here, Jacques's complaints to Altilio pertained to (1) N.Y. Lab. Law § 299(1) ("Every work room in a factory shall be provided with proper and sufficient means of ventilation … at all times during the working hours."), and (2) Article 13 N.Y. Lab. Law § 350, *et. seq.* (establishing standards for Industrial Homework). Because Jacques was terminated soon after her complaints to Altilio, the Court concludes that there exists an issue of material fact as to whether her labor law complaints were a motivating factor in her discharge. *See Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 109 (2d Cir.2001) (noting that "term 'motivating factor' is a standard one" in field of employment discrimination).

### B. DiMarzio's Counterclaim

The Court is deeply troubled by DiMarzio's $500,000 counterclaim, which appears to be nothing more than a naked form of retaliation against Jacques, a vulnerable plaintiff who suffers from a significant mental impairment, for filing her lawsuit. She should not be subjected to *in terrorem* tactics.

■ In considering a motion for summary judgment, if the Court's analysis reveals that there are no genuine issues of material fact, but that the law is on the side of the nonmovant, the Court may grant summary judgment in favor of the nonmovant even in the absence of a cross-motion. *See Int'l Union of Bricklayers and Allied Craftsmen v. Gallante*, 912 F.Supp. 695, 700 (S.D.N.Y.1996). Summary judgment may be granted to the nonmovant in such circumstances so long as the movant has had an adequate opportunity to come forward with all of its evidence. *See Orix Credit Alliance, Inc. v. Horten*, 965 F.Supp. 481, 484 (S.D.N.Y. 1997); *Cavallaro v. Law Office of Shapiro & Kreisman*, 933 F.Supp. 1148, 1152 (E.D.N.Y.1996); *see also* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (2d ed.1983).

■ The Court will afford DiMarzio the opportunity to submit legal authority and evidence to justify its counterclaim, if it can, and to explain why Rule 11 sanctions should not be imposed. *See* Fed. R.Civ.P. 11(b)(1)(B) ("On its own initiative,

the court may enter an order describing the specific conduct that appears to violate [Rule 11] and directing an attorney, law firm, or party to show cause why it has not violated [Rule 11].");  *Martens v. Thomann,* 273 F.3d 159, 175 (2d Cir.2001) ("[S]anctions may not be imposed without notice and an opportunity to be heard.");  *McMahon v. Shearson/American Express., Inc.,* 896 F.2d 17, 21 (2d Cir.1990) (noting that goal of Rule 11 is to "discourag[e] dilatory and abusive litigation tactics and eliminat[e] frivolous claims and defenses, thereby speeding up and reducing the costs of the litigation process");  *see also Hudson v. Moore Business Forms, Inc.,* 836 F.2d 1156, 1163 (9th Cir.1987) (imposing Rule 11 sanctions where damage claims in defendant's counterclaim were "frivolous and brought to harass" plaintiff);  *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff,* 638 F.Supp. 714 (S.D.N.Y.1986) (imposing Rule 11 sanctions where defendant and his attorney acted in bad faith by alleging frivolous affirmative defenses and meritless counterclaim).  Rule 11 is designed to protect the same fundamental rights that would be implicated if a governmental actor were to interfere with an individual's First Amendment right of access to the courts by filing frivolous and retaliatory counterclaims.  *See, e.g., Brown v. Stone,* 66 F.Supp.2d 412, 435 (E.D.N.Y.1999) ("An individual's constitutional right of access to the courts cannot be impaired, either directly . . . or indirectly, by threatening or harassing an [individual] in retaliation for filing lawsuits.") (quoting *Harrison v. Springdale Water & Sewer Commission,* 780 F.2d 1422, 1427–28 (8th Cir.1986) ("[A]ccess to the courts is a fundamental right of every citizen.")).

Although it remains to be determined whether Rule 11 sanctions are appropriate in this case, the Court pauses to admonish the practicing bar against asserting baseless, retaliatory counterclaims. Such claims constitute the type of abusive, harassing practices proscribed by Rule 11 and violate "the principle that attorneys and . . . litigants have an obligation to the court to refrain from conduct that frustrates the aims of [Fed.R.Civ.P. 1]." Fed.R.Civ.P. 11 Advisory Commitee Notes (1993);  *cf.* Fed.R.Civ.P. 1 ("[The Federal Rules of Civil Procedure] shall be construed and administered to secure the just, speedy, and inexpensive determination of every action.").

## CONCLUSION

DiMarzio's motion is denied.  DiMarzio shall have thirty days to submit papers in support of its counterclaim and to address the issue of Rule 11 sanctions.

## SO ORDERED.

## *SUPPLEMENTAL DECISION*

On February 27, 2002, the Court denied defendant's motion for summary judgment.  *See Jacques v. DiMarzio,* 200 F.Supp.2d 151 (E.D.N.Y.2002).  Subsequently, the Court, independent of the parties, learned of the Eighth Circuit's decision in *Weber v. Strippit,* 186 F.3d 907 (8th Cir.1999), which held, *inter alia,* that "regarded as" disabled plaintiffs are not entitled to reasonable accommodations under the Americans with Disabilities Act ("ADA").  *See id.* at 917.  That decision has triggered the Court to now move, *sua sponte,* to reconsider that part of its decision that held, contrary to *Weber,* that if plaintiff Audrey Jacques ("Jacques") could establish that she was perceived to be disabled, she could contend that she was entitled to a reasonable accommodation.  *See Nabisco v. Warner Lambert Co.,* 32 F.Supp.2d 690, 694 (S.D.N.Y.1999) ("[B]ecause the denial of a motion for summary judgment is an interlocutory order, the trial court is free to

reconsider ... its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law.") (internal quotation marks omitted).

## THE LEGAL LANDSCAPE

In reaching its holding in *Weber*, the Eighth Circuit reasoned that

[i]mposing liability on employers who fail to accommodate non-disabled employees who are simply regarded as disabled would lead to bizarre results. Assume for instance, that [plaintiff's] heart condition prevented him from relocating ... but did not substantially limit any major life activity. Absent a perceived disability, defendants could terminate [plaintiff] without exposing themselves to liability under the ADA. If the hypothetical is altered, however, such that defendants mistakenly perceive [plaintiff's] heart condition as substantially limiting one or more major life activities, defendants would be required to reasonably accommodate [plaintiff's] condition by, for instance, delaying his relocation.... Although [plaintiff's] impairment is no more severe in this example than in the first, [plaintiff] would now be entitled to accommodations for a non-disabling impairment that no similarly situated employee would enjoy.

186 F.3d at 916. *Weber* concluded that Congress could not have "intended to create a disparity among impaired but non-disabled employees, denying most the right to reasonable accommodations but granting to others, because of their employers' misperceptions, a right to reasonable accommodations no more limited than those afforded actually disabled employ-

ees." *Id.* at 917. Its holding sweeps broadly, and would render nugatory the concept of reasonable accommodation in all "regarded as" cases.

*Weber* noted that "[n]o court has squarely addressed whether employers must reasonably accommodate perceived disabilities," although it believed that two other circuits had "indirectly considered the issue [and] suggested different outcomes." *Weber*, 186 F.3d at 916. It referenced in that regard the First Circuit's decision in *Katz v. City Metal Co.*, 87 F.3d 26 (1st Cir.1996) and the *dicta* footnote comments made by the Third Circuit, sitting *en banc*, in *Deane v. Pocono Med. Ctr.*, 142 F.3d 138 (3d Cir.1998) (*en banc*). As explained in *Weber*, in *Katz* the First Circuit had reversed the district court's judgment as a matter of law for the defendant because the circuit court held that a "regarded as" disabled plaintiff had presented sufficient evidence that he could have performed the essential duties of his job with reasonable accommodation.

In contrast, the *Weber* court noted, a divided panel of the Third Circuit had held in *Deane* that a " 'regarded as' plaintiff is not statutorily entitled to accommodation from her employer." *Weber*, 186 F.3d at 917 (citing *Deane*, 142 F.3d at 140–41). As *Weber* further noted, on *en banc* review in *Deane* the circuit court remanded because of its resolution of a different issue; consequently, "the court did not reach 'the more difficult question ... whether "regarded as" disabled plaintiffs must be accommodated by their employers if they cannot perform the essential functions of their jobs.' " *Id.* (citing *Deane*, 142 F.3d at 148–49 n. 12).[1]

---

1. The Court has no knowledge of the issue that divided the panel in *Deane* or if there was an explanation for the holding on the availability of reasonable accommodations for

"regarded as" plaintiffs since that case is unreported and not located on any electronic database.

Although the *en banc* decision in *Deane* did not reach the reasonable accommodation issue, it framed the debate by presenting the parties' respective arguments on the issue. It also commented that there was "considerable force to the argument that 'regarded as' disabled plaintiffs are not entitled to accommodations" because to allow reasonable accommodations for "regarded as" plaintiffs would: "(1) permit healthy employees to, through litigation (or the threat of litigation), demand changes in their work environments under the guise of 'reasonable accommodations' for disabilities based upon misperceptions; and (2) create a windfall for legitimate 'regarded as' disabled employees who, after disabusing their employers of their misperceptions, would nonetheless be entitled to accommodations that their similarly situated co-workers are not, for admittedly non-disabling conditions." *Deane*, 142 F.3d at 148–49 n. 12. *Weber* also cited a comment from a later Third Circuit case, *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180 (3d Cir.1999), that " '[i]t seems odd to give an impaired but not disabled person a windfall because of her employer's erroneous perception of disability, when other impaired but not disabled people are not entitled to an accommodation.' " *Weber*, 186 F.3d at 917 (quoting *Pathmark Stores*, 177 F.3d at 195).

*Weber* adopted these arguments, even though the *en banc* decision in *Deane* cautioned that "we express no position on the accommodation issue," *Deane*, 142 F.3d at 148–49 n. 12, and *Pathmark Stores* explicitly noted that the Third Circuit had yet to resolve the question of whether "regarded as" plaintiffs are entitled to reasonable accommodations. *See Pathmark Stores*, 177 F.3d at 196.

Neither the Second Circuit nor any district court in the Second Circuit has addressed the issue. The Court's research has revealed that, prior to *Weber*, the Fifth and Sixth Circuits had also held, albeit without explication, that "regarded as" disabled plaintiffs are not entitled to reasonable accommodations. *See Workman v. Frito–Lay, Inc.*, 165 F.3d 460, 467 (6th Cir.1999); *Newberry v. East Texas State Univ.*, 161 F.3d 276, 280 (5th Cir.1998).

Seven out-of-circuit district courts have opined on the issue; they each were decided subsequent to *Weber*. One district court in the Third Circuit, two in the Fifth Circuit, one in the Seventh Circuit, and two in the Ninth Circuit, have followed the holding and reasoning of *Weber*. *See Danyluk Coyle v. St. Mary's Med. Ctr.*, No. 00 CV 5943, 2001 WL 771048, at *3 (E.D.Pa. April 5, 2001); *Price v. City of Terrell*, No. 99 CV 0269, 2000 WL 1872081, at * 5 (N.D.Tex. Dec.20, 2000); *Matlock v. City of Dallas*, No. 97 CV 2735, 1999 WL 1032601, at * 5 (N.D.Tex. Nov.12, 1999); *Ross v. Matthews Employment*, No. 00 CV 1420, 2000 WL 1644584, at *5 (N.D.Ill. Oct.27, 2000); *Deppe v. United Airlines*, No. 96 CV 02941, 2001 WL 902648, at * 6 (N.D.Cal. Jul.31, 2001); *Fontanilla v. City and County of San Francisco*, No. 96 CV 3916, 2001 WL 513395, at * 15 (N.D.Cal. Feb.28, 2001). However, a district court in the First Circuit, although noting that it was bound by *Katz*, *see Ithaca College v. NLRB*, 623 F.2d 224, 228 (2d Cir.1980) (district courts and other inferior courts are bound by decisions of Court of Appeals in appropriate circuit unless overruled by intervening Supreme Court decision or other change in law), criticized *Weber* and gave substantive content to the conclusory decision in *Katz*, explaining:

"with respect to [disabilities an employer knows about or perceives] ... the emphasis is on encouraging the employer to engage in an interactive process with the employee to determine effective reasonable accommodation." *Katz*, 87 F.3d

at 33.... If an employer fails to explore an employee's need for a reasonable accommodation when the employer wrongly regards the employee as being disabled, opting instead to take adverse action against the employee, it is hardly a "bizarre" result to hold the employer accountable. Indeed, the purpose of the ADA was, in part, to punish employers for making just this sort of "stereotypic [assumption] not truly indicative of the individual ability" of their employees. 42 U.S.C. § 12101(7).

*Jewell v. Reid's Confectionary Co.,* 172 F.Supp.2d 212, 219 (D.Me.2001) (citations omitted).

## DISCUSSION

■ [1] The Court disagrees with *Weber* and all the other courts that have held that reasonable accommodations should not be available where a plaintiff is "regarded as" disabled. The Court's conclusion is driven by a number of considerations: (1) the plain language of the ADA; (2) the legislative history behind the "regarded as" prong; (3) the mandatory interactive process, as referenced in *Jewell,* and (4) the Court's critiques of *Weber's* underlying rationale.

### 1. Plain Language of the Statute

■ [2] The first step in interpreting a statute "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). The Court notes, as other courts have, that the plain language of the statute does not distinguish between "regarded as" disabled plaintiffs and actually disabled plaintiffs in defining who is a "qualified individual." *See* 42 U.S.C. § 12111(8) (defining "qualified individual" as one "who, with or without rea-

sonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"); *see also* 29 C.F.R. § 1630.2(m); *Pathmark Stores,* 177 F.3d at 196 ("[T]he [ADA] statute does not appear to distinguish between disabled and 'regarded as' individuals in requiring accommodation."); *Deane,* 142 F.3d at 147 ("[N]owhere in the Act does it distinguish between actual or perceived disabilities in terms of the threshold showing of qualifications.").

### 2. Legislative History

The legislative history supports the Court's conclusion that Congress intended that "regarded as" plaintiffs with impairments be entitled to reasonable accommodations. Congress noted that the rationale for the "regarded as" prong of the ADA was articulated by the Supreme Court in *School Board of Nassau County v. Arline.* The Court noted that although an individual may have an impairment that does not in fact substantially limit a major life activity, the reaction of others may prove just as disabling. "Such an impairment might not diminish a person's physical or mental capabilities, but could nevertheless substantially limit that person's ability to work as a result of the negative reactions of others to the impairment."

The Court concluded that, by including this test, "Congress acknowledged that society's accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment." Thus, a person who [suffers an adverse employment action] because of the myths, fears and stereotypes associated with disabilities would be covered under [the "regarded as" prong], whether or not the employer's perception was shared by others in the field and wheth-

er or not the person's physical or mental condition would be considered a disability under the first or second part of the definition.

> Sociologists have identified common barriers that frequently result in employers excluding disabled persons. These include concerns regarding . . . acceptance by co-workers and customers.

H.R. Rep. 101–485(III), 1990 U.S.C.C.A.N. 445, 453 (quoting *Sch. Bd. of Nassau County v. Arline*, 480 U.S. 273, 284, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)). In *Arline*, the Supreme Court held that a teacher who had a contagious but not substantially limiting form of tuberculosis was "handicapped" under the "regarded as" prong of the Rehabilitation Act. *See Arline*, 480 U.S. at 284. The Court also noted that the teacher was entitled to reasonable accommodations. *See id.* at 289 n. 19. Congress's explicit recall of *Arline* in the legislative history of the ADA is a template of legislative intent since the ADA must be construed "to grant at least as much protection as provided by . . . the Rehabilitation Act." *Bragdon v. Abbott*, 524 U.S. 624, 632, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). Moreover, ADA regulations recognize *Arline's* rationale for the "regarded as" prong. *See* 29 C.F.R. § 1630.2(*l*) ("Is regarded as having such an impairment means: . . . . (2) Has a physical or mental impairment that substantially limits major life activities as a result of the attitudes of others toward such impairment. . . .)

The Court agrees, therefore, with the argument advanced by the plaintiff in *Deane* that the " 'regarded as' prong of the disability definition is based upon the reality that the perception of disability, socially constructed and reinforced, is difficult to destroy, and in most cases, merely informing the employer of its misperception will not be enough to eliminate the limitation;"

consequently, "failure to mandate reasonable accommodations would undermine the role the ADA plays in ferreting out disability discrimination in employment." *Deane*, 142 F.3d at 148 n. 12.

Notably, as the Court was penning this decision, the Supreme Court rendered its decision in *U.S. Airways v. Barnett*, —— U.S. ——, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002), lending support to the notion that the ADA was designed to redress insidious misperceptions of employee disabilities stemming from the prejudices and biases of employers and co-workers. As the Court explained:

> The statute seeks to diminish or to eliminate the stereotypical thought processes, the thoughtless actions, and the hostile reactions that far too often bar those with disabilities from participating fully in the Nation's life, including the workplace. . . . These objectives demand unprejudiced thought and reasonable responsive reactions on the part of employers and fellow workers alike.

*Id.* at *6 (citations omitted).

The following examples illustrate the need for reasonable accommodations in "regarded as" scenarios:

> 1) Plaintiff A, a police officer, has a mild form of multiple sclerosis. Even though he is not disabled under the ADA, his employer has learned of the impairment and mistakenly believes that it substantially limits his ability to work. Many of his fellow officers also know of the impairment, and as a consequence, refuse to work with him for fear that he will be an unreliable partner. He is fired.
> 2) Plaintiff B, an office worker, has a mild form of schizophrenia. Even though she is not disabled under the ADA, her employer has learned of the impairment and mistakenly believes that it substantially limits her ability to interact with others. Many of her co-work-

ers also know of the impairment, and as a consequence, believe her to be "crazy." She is unable to interact with her co-workers because of their attitudes and is fired.

In both of these scenarios, the plaintiffs are not disabled by their impairments, but are substantially limited "as a result of the attitudes of others toward [their] impairment[s]." 29 C.F.R. § 1630.2 (*l*)(2). Under *Weber*, these plaintiffs would not be entitled to reasonable accommodations even though they were substantially limited as a result of "the accumulated myths and fears [about their] ... diseases." *Arline*, 480 U.S. at 284. It is easy to imagine countless other scenarios where a nondisabling impairment, such as Jacques's bipolar disorder, may become disabling under the ADA's "regarded as" prong because of the prejudicial and biased attitudes of others. As the plaintiff correctly noted in *Deane*, it will not always be sufficient for employees to merely "disabus[e] their employers of their misperceptions...." 142 F.3d at 148 n. 12. Congress provided for reasonable accommodations for such "regarded as" plaintiffs to counter the prejudices of employers and co-workers who, in the absence of an accommodation, may otherwise erroneously perpetuate a disabling view of a discharged employee's nondisabling impairment. In such situations, the employer has at its disposal the full panoply of reasonable accommodations contemplated by the statute to find a proper fit to address such insidious prejudices. *See* H.R. Rep. 101–485(III) at 34, 1990 U.S.C.C.A.N. at 457 ("Examples of possible [reasonable] accommodations include ... job restructuring, ... reassignment, ... appropriate adjustment or modifications of ... training materials or policies ... and other similar accommodations."); 42 U.S.C. § 12111(9)(B).

Categorically denying reasonable accommodations to "regarded as" plaintiffs would allow the prejudices and biases of others to impermissibly deny an impaired employee his or her job because of the mistaken perception that the employee suffers from an actual disability. This is the concern addressed by Congress, but ignored by *Weber*.

### 3. Mandatory Interactive Process

Although the Second Circuit has not yet addressed the issue, the "vast majority" of courts that have done so have held that employers have a mandatory obligation to engage in an interactive process with employees who may be in need of an accommodation for their disabilities. *See Barnett v. U.S. Air*, 228 F.3d 1105, 1112 (9th Cir.2000), *rev'd on other grounds*, —— U.S. ——, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002); *see also Barnett*, —— U.S. ——, 122 S.Ct. 1516, 152 L.Ed.2d —— (Stevens, J., concurring) (noting that the Ninth Circuit's holding with respect to interactive process was "correct[ ]" and "is untouched by the [Supreme] Court's opinion"). Although this obligation is not explicitly statutorily provided for, it is viewed as being "inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir.1999). As the legislative history makes clear:

A problem-solving approach should be used to identify the particular tasks or aspects of the work environment that limit performance and to identify possible accommodations.... [E]mployers first will consult with and involve the individual with a disability in deciding on the appropriate accommodation.

S.Rep. No. 101–116, at 34 (1989); *see also* H.R.Rep. No. 101–485, pt. 2, at 65 (1990),

U.S.Code Cong. & Admin.News at 303, 348.

Pursuant to its regulatory authority under the ADA, *see* 42 U.S.C. § 12116, the EEOC has issued implementing regulations. *See, e.g.* 29 C.F.R. § 1630.2(*o*)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informed, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."); 29 C.F.R. Pt. 1630, App. § 1630.9 ("[T]he employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability.").

■■■ "The interactive process is triggered either by a request for accommodation by a disabled employee or by the employer's recognition of the need for such an accommodation." *Barnett*, 228 F.3d at 1112. In that latter regard, the EEOC has explained that "[a]n employer should initiate the reasonable accommodation interactive process without being asked if the employer: (1) knows that the employee has a disability, (2) knows, or has reason to know, that the employee is experiencing workplace problems because of the disability, and (3) knows, or has reason to know, that the disability prevents the employee from requesting a reasonable accommodation." *Id.* (quoting *EECOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, EEOC Compliance Manual (CCH), § 902, No. 915.002 at 5459 (March 1, 1999)). This does not require the employer to have knowledge that the employee was actually disabled within the strictures of the ADA; it is sufficient if the employer had "enough information to put it on notice that [the employee] *might* have a disability." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 314 (3rd Cir. 1999)(*en banc*) (emphasis added) (holding interactive process triggered when employer knew that employee had a psychotic episode at work and was hospitalized immediately thereafter, although employer was not aware that employee had been diagnosed as suffering from bipolar disorder).

■■■ It is at once apparent that the employer's obligation to engage in the interactive process is certainly triggered once the employer regards an employee who has requested an accommodation as being disabled. At that time the door is open for the employer to explore "what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered [the] employee's request, and offer and discuss available alternatives when the request is too burdensome." *Phoenixville*, 184 F.3d at 317. The focus of the interactive process centers on employee-employer relationships so that capable employees can remain employed if their medical problems can be accommodated, rather than on sounding a clarion call to legal troops to opine on whether the employee's impairment is an actual disability within the legal nuances of the ADA. Realistically, the employer will not at this stage be centered on assessing whether the employee's impairment is truly a disability under the ADA. In all likelihood, in the absence of on-the-spot legal counsel, the employer may not even realize that the legal concept of "disability" means something other than the employee's inability to perform the job for which he was hired. *See, e.g. Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)

("To be substantially limited in the major life activity of working ... one must be precluded from more than one type of job, a specialized job, or a particular job of choice."); *Giordano v. City of New York*, 274 F.3d 740, 747–48 (2d Cir.2001) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.") (quoting 29 C.F.R. § 1630.2(j)(3)).

In a practical sense, therefore, the interactive process is more of a labor tool than a legal tool, and is a prophylactic means to guard against capable employees losing their jobs even if they are not actually disabled. It is clearly a mechanism to allow for early intervention by an employer, outside of the legal forum, for exploring reasonable accommodations for employees who are perceived to be disabled. As the Third Circuit aptly observed in *Phoenixville*:

> [T]he interactive process can be thought of as a less formal, less costly form of mediation.... Mediated settlements ... are cheaper than litigation, can help preserve confidentiality, allow the employee to stay on the job, and avoid monetary damages for an employer's initially hostile responses to requests for accommodations. The interactive process achieves these same goals even more effectively.

184 F.3d at 316 n. 6. This practical view of the statutory scheme is consistent with the Court's conclusion that Congress intended reasonable accommodations to be part of the "regarded as" prong of the ADA. *See Barnett*, —— U.S. ——, 122 S.Ct. 1516, 1523, 152 L.Ed.2d —— (recognizing that "reasonable accommodation" should be viewed "in a practical way," consistent with the need to take a "practical view of the statute").

#### 4. *Critiques of* Weber's *Rationale*

*Weber* takes issue with the fact that the plain language of the ADA allows the sup-posedly "bizarre" result of different outcomes for similarly situated individuals based on the perceptions of their employers. 186 F.3d at 916. However, an employee who is simply impaired and an employee who is impaired *and* "regarded as" disabled are not similarly situated since the "regarded as" disabled employee is subject to the stigma of the disabling and discriminatory attitudes of others.

Notably, plaintiffs' claims under other discrimination statutes often hinge on defendants' perceptions. *See, e.g., Estate of Amos ex rel. Amos v. City of Page, Arizona*, 257 F.3d 1086, 1094 (9th Cir.2001) (stating in context of 42 U.S.C. § 1983 racial discrimination claim: "That [plaintiff] was actually white does not make [discrimination based upon mistaken racial identity] or its resulting injury less direct."); *Perkins v. Lake County Dept. of Util.*, 860 F.Supp. 1262, 1277 (N.D.Oh. 1994) (noting in context of Title VII racial discrimination claim: "[I]t is the employer's reasonable belief that a given employee is a member of a protected class that [is dispositive].... [C]onsistent with the intent of Title VII, when racial discrimination is involved[,] perception and appearance are everything."). Indeed, punitive damages under the ADA hinge on the employer's mind state, resulting in arguable "windfalls" for plaintiffs who are able to show that their employers had the requisite mind state, while similarly situated employees unable to do so receive smaller damages. *See Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 536, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) ("[A]n employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages.").

Finally, to the extent that *Weber* expresses concern that undeserving employees would incessantly demand uncalled for accommodations, the employer is protected

by the good faith requirement implicit in the ADA's regulatory scheme. *See* 29 C.F.R. § 1630.2(*o*)(3); 29 C.F.R. Pt. 1630, App. § 1630.9 at 359; *Phoenixville,* 184 F.3d at 312 ("Based on the regulation and the interpretive guidelines, we [have] held that both parties have a duty to assist in the search for appropriate reasonable accommodations and to act in good faith.") (internal quotation marks omitted); *Humphrey v. Mem'l Hosp. Ass'n,* 239 F.3d 1128, 1137 (9th Cir.2001) ("The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees ....."), *cert. denied,* —— U.S. ——, 122 S.Ct. 1592, —— L.Ed.2d —— (2002); *Barnett,* 228 F.3d at 1114–15 (same); *Smith,* 180 F.3d at 1172 ("The interactive process includes good-faith communications between employer and employee."); *see also Baert v. Euclid Beverage, Ltd.,* 149 F.3d 626, 634 (7th Cir. 1998) ("[N]either party should be able to cause a breakdown in the [interactive] process for the purpose of either avoiding or inflicting liability."); *Beck. v. Univ. of Wis. Bd. of Regents,* 75 F.3d 1130, 1135–37 (7th Cir.1996) (employee's unwillingness to cooperate in interactive process in good faith precludes employer's liability).[2]

## CONCLUSION

For all of the above reasons, the Court adheres to its original decision in all respects.

**SO ORDERED.**

---

**2.** The ADA provides an incentive for employers to engage in the interactive process in good faith by precluding compensatory and punitive damages against employers that make "good faith efforts, in consultation with the person with the disability ... to identify and make a reasonable accommodation...." 42 U.S.C. § 1981a (3); *see Roberts v. Progressive Independence, Inc.,* 183 F.3d 1215, 1223 (10th Cir.1999):